CASE 94—PETITION EQUITY—MAY 28.

# City of Louisville vs. Louisville Rolling Mill Company.

### APPEAL FROM LOUISVILLE CHANCERY COURT.

1. The general council of Louisville ordered and required part of Brook street to be regraded, and the additional embankment, caused by the regrading, to be protected by filling up the front of adjacent lots, or by a perpendicular wall—all to be done at the expense of the lot-owners. On the grounds that the proposed grade would raise said street in front of their mills and lot so as to exclude light and air from their mills, and prevent the use of their only passway for ingress and egress to and from their mills, and that the damage to their property and business, resulting from such improvements, would be irreparable, the Louisville Rolling Mill Company sued out an injunction against the city and its contractors to prevent the making of said improvements. The judgment of the chancellor perpetuating temporarily the injunction *is affirmed*, with directions to him, to keep control of the cause, and to modify the injunction, from time to time, upon proper application, as directed in the opinion of the court.

2. Cities have not the absolute uncontrollable right to order such improvements of the streets as they may deem necessary or beneficial at the expense of the property-holders, and in utter disregard of their interest, and without compensation; for it sometimes happens that such improvements will not only render the property entirely valueless to the owner, but more—take it from him to pay for its own improvement, besides destroying his business, and sometimes causing him to contribute from his other means to its destruction.

3. So long as the city confined the improvement to the boundary of the street, and interfered with no private right of light, air, or private passway, the incidental injury to the lot-owners would be of that class of misfortunes, to them, for which no remedy for the injury is afforded by law. (*Keasy vs. Louisville,* 4 *Dana,* 154; *Radcliff's ex'rs vs. Mayor, &c., of Brooklyn,* 4 *Comstock,* 195.)

4.  Lot-owners in cities and towns may be presumed to have purchased, in contemplation of the power in the local authorities to direct them to make such improvements as are ordinary and useful, at their own expense; but when the improvements are of an extraordinary character, and so peculiarly injurious to the proprietors as to result, to some considerable extent, in a deprivation of the use of their property, and injury to their business, such improvements should not be made without compensation.

BARR & WRIGHT and
ROBT. J. ELLIOTT,                                    For Appellant,

CITED—

*Charter of Louisville, secs.* 2, 6, *art.* 7, *and sec.* 10, *charter of* 1828.

*Amr. Law Reg.* 1865, *Nov. No.* ; *Mills vs. Brooklyn, p.* 37.

2 *Blackstone,* 14, 264, 265.

7 *Dana,* 429 ; *Briebaker vs. Paul, &c.*

7 *Johnson's Chy. R.,* 328, 336 ; *Jerome vs. Ross.*

*Story's Eq., Redfield's ed., sec.* 929.

25 *Vermont R.,* 49 ; *Hatch vs. Vermont C. Railway.*

23 *Ga. R.,* 402 ; *Markham vs. Mayor, &c.*

2 *Johnson's Chy. R.,* 463 ; *Belknap vs. Belknap.*

*MSS. Opns.; Louisville vs. Lyons, &c., and White, &c.,* 1856.

1 *Denio,* 595 ; *Wilson vs. Mayor, &c., of New York.*

18 *Penn. R.,* 187 (6 *Harris*) ; *O'Conner vs. City of Pittsburg.*

2 *Dutcher,* 49 ; *City of Camden vs. Mulford.*

5 *Harrington,* 243 ; *Clark vs. City of Wilmington.*

4 *Mich. R.,* 435 ; *Dermont vs. Mayor, &c., Detroit.*

12 *Mo.,* 414 ; *Gunn vs. City of St. Louis.*

14 *Mo.,* 20 ; *Taylor, &c., vs. St. Louis.*

15 *Mo.,* 610 ; *Lambar vs. City of St. Louis.*

27 *Miss.,* 357 ; *White et ux. vs. Yazoo City.*

City of Louisville vs. Louisville Rolling Mill Company.

10 *Ohio*, 159 ; *Rhodes vs. City of Cleveland.*

15 *Ohio*, 476 ; *McCombs vs. Akron.*

18 *Ohio*, 229 ; *Akron vs. McCombs.*

4 *Ohio*, 80 ; *Dayton vs. Pease.*

35 *Penn.* (11 *Casey*), 329 ; *Carr, &c., vs. N. Liberties.*

W. P. Boone,                              On same side,

CITED—

2 *Cranch*, 127 ; 2 *Johnson*, 109.

*City Charter of Louisville of* 1851, *art.* 7, *sec.* 2.

4 *Dana*, 154 ; *Keasy vs. City of Louisville.*

2 *Hilliard on Torts*, 151, *&c.*

6 *Ia.*, 240 ; *Snyder vs. Rockford.*

4 *Comstock*, 195 ; *Radcliff's ex'rs vs. Brooklyn.*

M. C. Johnson,

H. J. Stites, and

J. F. Bullitt,                            For Appellees,

CITED—

*Civil Code, secs.* 305, 306, 321.

5 *Harr.* (*Del. R.*), 243 ; *Clark vs. Wilmington.*

13 *Wendell*, 355 ; *The People vs. Canal Commissioners.*

26 *Id.*, 404 ; *The Commissioners vs. Kempshall.*

6 *Cowen*, 518 ; *ex parte Jennings.*

3 *Kent's Com.*, 517, 7*th ed.*

*Angell on Water-courses, secs.* 466, 476, *and cases cited.*

*Charter of* 1780 ; 10 *Hennings St. Va.*, 293.

*Charter of* 1828 ; *Session Acts*, 208, *sec.* 7.

4 *Term R.* (*D. & East.*), 794 ; *The Governor, &c., vs. Meridith.*

2 *Barn. & Cres.*, 703 ; *Boulton vs. Crowthers.*

6 *Taunt.*, 34 ; *Sutton vs. Clark.*

1 *Nott & McCord*, 387 ; *Stark vs. McGowan.*

14 *Mo.*, 20 ; *Taylor vs. City of St. Louis.*

9 *Watts*, 385 ; *Green vs. Borough, &c.*

City of Louisville vs. Louisville Rolling Mill Company.

6 *Wheaton*, 593 ; *Gossler vs. Georgetown.*

18 *Penn. St.*, 187 ; *O' Conner vs. Pittsburg.*

4 *Dana*, 155 ; *Keasy vs. Louisville.*

*Sedgwick on Con. and Statute Law,* 519, 524.

2 *Bush*, 452 ; *Terrill vs. Rankin.*

*Angell on Highways, sec.* 214, *note* 1, *secs.* 93, 202, 218 *note* 1.

23 *Verm.*, 364 ; *Livermore vs. Jamaica.*

5 *Dana*, 28 ; 7 *Id.*, 81 ; 9 *Id.*, 114.

13 *Wendell*, 372–3 ; 25 *Id.*, 464 ; 26 *Id.*, 404.

12 *Mass.*, 483 ; 14 *Conn.*, 146 ; 18 *Ohio*, 232.

12 *Mass.*, 220 ; *Thurston vs. Hancock.*

1 *Pick.*, 418, 434 ; *Callender vs. Marsh.*

4 *Comstock*, 195 ; *Radcliff's ex'r vs. Mayor, &c., of Brooklyn.*

24 *Penn.*, 207 ; *Paul vs. Carver.*

8 *Dana*, 294 ; 3 *B. Mon.*, 27 ; 17 *B. Mon.*, 763.

6 *Watts & Serg.*, 115 ; 12 *Mo.*, 424 ; 21 *Pick.*, 348.

2 *Johnson's C. R.*, 162 ; 10 *Ohio*, 160 ; 15 *Ohio*, 474.

*MSS. Opn.*, 1856 ; *Louisville vs. White.*

*MSS. Opn.*, 1856 ; *Louisville vs. Lyons.*

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

This is a controversy as to the right of the city, through her constituted authorities, to regrade Brook street, so as to raise the grade, without compensation to appellees.

The lot involved in this controversy, whereon is situated the Rolling Mill and its fixtures, costing some two hundred thousand dollars, is bounded four hundred and twenty feet on the south by Washington street, which runs parallel with the Ohio river; on the west three hundred and seventy-four feet by Brook street, running out from the river to the south boundary of the city; on

the north by Water street, running parallel with Wash-
ington street; and on the east by Floyd street, running
from the river south, parallel with Brook street.

Beargrass creek runs north of Water street and be-
tween this lot and the river. Between it and the river
there is a low level plateau of land subject to overflow;
indeed, Water street is subject to overflow so as to inun-
date appellees' lot and obstruct the operation of their
mill yearly once or oftener.

In the year 1836, the city council determined the grade
of Brook street, and, perhaps, had it improved the follow-
ing year.

October 19, 1847, the city council determined to par-
tially pave a portion of Brook street, twenty feet wide,
" in concave form," in the center of the street, so as to
form a gutter, and, at the same time, in " such shape as
will cause it to be worked into the remaining paving
when it shall be put down."

There is some controversy whether this was done at
the public expense of the city or private expense of the
lot-owners; but however this may be, the work was
done, including that part of Brook street fronting appel-
lees' lot, and an apportionment of the expense of im-
proving said street was made between the city and
proprietors of lots; and appellees aver, in their petition,
that Preston, who owned one half and was trustee for
the other, paid the assessment on this lot for said im-
provement; but the evidence tends to disprove this.

In 1843, the then proprietors first built a rolling mill
on that part of the lot contiguous to Brook street, and
used it mainly as the means of ingress and egress for
hauling and other purposes to and from their mill.

These proprietors were lessees for a term of ten years,
with the right of removing their buildings, machinery,

&c., even during the term. The present owners, in the years.1854 and 1857, became the proprietors of both the lease and lot in fee.

In the years 1861–2–3, the present proprietors improved and remodeled their mills, removing the machinery, &c., further back from Brook street some fifteen to forty feet.

In the year 1850, the city erected over Beargrass creek, where Brook street crosses it, a very substantial stone bridge, corresponding with the then grade and improvement of the street.

These mills are built on the northern portion of the lot, which is below Brook street, as improved in 1846, from five to eight feet, where these mills are situated, and some twenty-five feet at the intersection of Brook and Washington, and along the latter. These are extensive mills, giving employment to one hundred and twenty-five to one hundred and fifty operatives, and doing, yearly, half a million dollars amount of business. Their only outlet to the river is through Brook street, as Floyd street is not so improved, between Washington street and the river, as to admit of the hauling of the very large amount of iron, coal, &c., which is essential to the business of these mills, there being no bridge across Beargrass creek on this street. Fulton street lays between Water street and the river, parallel with both.

August 29, 1865, the city council enacted an ordinance to further improve Brook street, between Main and Fulton streets, at the expense of the owners of the lots, except that part between Main and Washington streets and the intersections, Main street being south and parallel to Washington street; and, according to this ordinance, appellees aver that the regrading will raise Brook street fronting their lot, beginning at a point just north of Washington, from one inch to ten feet, and will

City of Louisville vs. Louisville Rolling Mill Company.

raise the street some twelve feet above their lot at the point where is situated their gate on Brook street, and is their only ingress and egress to and from their mills; said gate already being some three or four feet below the present grade, and will entirely exclude them from approach or departure, and the getting to the mills the vast materials necessary, and from them the large amount of manufactured articles.

By a subsequent ordinance of September 12, 1865, the lot-owners were required, on either side of Brook street, to cause so much of the front of their lots to be filled up, within ninety days, as may be necessary to correspond with the contemplated improvement of the street, and to protect the street whilst the improvement was being made, and to prevent its falling away after made, or said owners might erect a perpendicular wall so as to protect the street and the said improvement; and on failure, the city would have said work done at their expense.

Appellees filed their petition and obtained an injunction against the city and their contractors, who were preparing to execute the work according to said several ordinances. The city joined issue, and claimed the right under the act of February 18, 1864 (*Sess. Acts* 1864, *p.* 434), to enact and have executed these ordinances without let or hindrance, and without any pecuniary compensation to the lot-owners or others.

On the hearing, the chancellor perpetuated the injunction temporarily, until the city should, by a general plan, improve the surrounding streets, and saying " it would be a very good improvement, but it would be extremely injurious to plaintiffs, and would deeply affect the business and improvement of the city at this time." He then assigns as reasons against a perpetual injunction, that

when some general plan of improvement of the surrounding streets shall be adopted and executed, which might be very beneficial to the city, that the injunction might be dissolved on terms of compensation to the plaintiffs; but when such plan would be adopted or executed could not then be known. From this judgment, the city has appealed, and appellees assign cross-errors.

The counsel urge several divisions of the questions to be decided; but we shall investigate the main and controlling one, as we conceive it, whether the city has or can have, under our constitutional form of government, the unlimited, absolute, uncontrollable right to order such improvements of the streets as it may deem necessary or beneficial, at the expense of the property-holders, and in utter disregard of their interest, and without compensation; for it sometimes does happen that such improvements will not only render the property owned entirely valueless to the owner, but more—take it from him to pay for its own improvement, besides destroying his business, and sometimes cause him to contribute from his other means to its destruction. If cities may exercise this unlimited, uncontrollable, omnipotent power, then the declaration in our bill of rights, " that absolute arbitrary power over the lives, liberty, *and property* of freemen, exists nowhere in a republic—not even in the largest majority," becomes meaningless, if not absurd.

If the filling up of plaintiffs' lot be done so that the improvement of the street may have a sure base upon which to rest, their machinery and building must be removed at enormous costs, else buried under the filling; and if removed, it would not then have a sure, sound basis in this newly-filled area for the foundation of such ponderous erections and machinery.

If a perpendicular wall be erected by which to confine the filling of the street, then light and air are so essen-

tially excluded as to prevent its practical working for several of the warmest months of the year; nor can this by possibility be remedied by culverts and apertures though the street, for the very potent reason that the lot on the opposite side of the street is also required to be filled correspondingly; and even if it was sure that the owner thereof would erect a perpendicular wall instead of filling, yet he would be entitled to cover his lot with buildings, which would as effectually exclude both light and air, and appellees' passway through their gate would be destroyed.

Beside, if all the surrounding streets were improved so as to correspond with this contemplated improvement of Brook, this lot and machinery would be so far below the level of the streets as to render it wholly useless for its present purposes; and the same power that authorizes this improvement of Brook will authorize the improvement of the other streets, and thus, without compensation, plaintiffs' business, not in itself a nuisance, would be broken up, be compelled to remove elsewhere at enormous expense, lose the profits of their business in the meantime, and then be enormously taxed to pay for the improvements which would be so disastrous to their business. Verily, if this can be done without compensation, private property and private pursuits are held by the slender tenure of the will of others.

The right of eminent domain—the right to take private property for the public use—is a power almost without limit; but this essential safeguard is thrown around the owner that the public who wants or needs his property must compensate him for it. Nor does this in anywise impair or conflict with the essential right and power of local government over communities, such as towns and cities, in ordinary cases, to have the streets improved at

the expense of the property-holders thereon; for, ordinarily, they are most benefited, and it is only requiring them to keep their property in such condition as not to obstruct or injuriously hinder the public; for, legally speaking, each lot-owner holds the legal title to one half the street in his front, subject, it is true, to the public easement; besides, it may ordinarily be, and generally is, only a fair portion of the tax which may justly and legally be laid on him to keep up the streets and public passways which are so peculiarly beneficial to the realty of all towns and cities; and, moreover, each proprietor may be presumed to have purchased in contemplation of the power in the local authorities to direct him to erect such improvements as are ordinary and usual.

But when, owing to extraordinary facts, none of these presumptions and principles apply, and when to force the owner to make these improvements is virtually to confiscate his property, or even to permit it to be done, without compensation, is to destroy his property, the question then is, whether it is the constitutional exercise of legitimate legislative power or legislative spoliation.

In *Keasy vs. Louisville* (4 *Dana*, 154), this court recognized the full extent of the constitutional and legal rights of city councils to grade and pave or regrade and repave streets; but it is also guarded as to the abuses of which such powers might be productive, or to which they might be perverted.

In that case the street had been graded under the old charter of 1828, a small wooden house had been erected on the lot according to this grade, when, shortly before the suit was brought, the city authorities had caused the grade of the street to be raised about three feet, which necessitated a filling up of Keasy's lot and the raising and reconstructing his house; and for these damages he

sued the city. The court said : " But the public right to
regulate the common highways of the city is, of course,
*not arbitrary and unlimited; far* from it. *Private rights must
be regarded.* The public, like a common person, must so
use its own as not to injure another's property. It can-
not take private property for public use without paying
a just equivalent; *nor can it disturb any personal right of
enjoyment. But, without touching the plaintiff's lot, or in any
way encroaching upon it, or interfering with any prescriptive
right to light, or to private way,* the city had a clear and
perfect authority to raise its street higher or sink it lower
than the level of his lot, as he would, undoubtedly, have
had to elevate or sink his ground, without touching or
otherwise injuring or interfering with the public street."

And we think this well expresses the true and furthest
extent of constitutional and legal power. As the legal
right to the public easement of the streets was in the city
council, to be made useful to the public, and held for the
common use of all the citizens, there is no doubt, but, so
long as they confined the improvement to the boundary
of the street, and interfered with no private right of
light, air, or private passway, the incidental injury to
the lot-owners would be of that class of misfortune, to
them, for which no remedy for the injury is afforded by
law.

And to the same purport is the case of *Radcliff's execu-
tors vs. Mayor and Council of Brooklyn* (4 *Com. N. Y.
Rep.,* 197), which was a case of cutting down the street
so as to leave Radcliff's lot, with a bluff bank, elevated
above the street, and is quite a lengthy review of the
authorities and principles governing such cases; but,
like the case of *Keasy vs. Louisville,* it is guarded as to
the interference of private rights.

And both of these cases are consonant with the manuscript opinion of this court, September 29, 1859, in *Louisville vs. White, &c.*, in which it said : " But, although they (the citizens) must hold their ·property subject to such diminution in its value as may be reasonably contemplated as resulting from any improvement of the streets that the city authorities may deem proper to have made, still it does not follow that they will not be entitled to damages where, as in the present case, the injury they have sustained is of a peculiar and extraordinary character, resulting, to some considerable extent, in a deprivation of the use of their property, and not such ordinary injury as the proprietors of lots had a right to suppose they would be subjected to for the purposes of public improvement."

And this was also the doctrine in the case of *Louisville vs. Lyon et al. (Manuscript Opinion, December* 19, 1856), in which this court, recognizing the right of the city authorities to judge when and how a street should be improved, said : " But the public right to regulate the common passways of the city is, of course, not arbitrary and unlimited. *Private rights must be regarded.* The public, like a private person, must so use its own as not to injure another's property."

In this case now under advisement, so far from using its own so as not to injure the property of another, and confining the improvement wholly to the street boundary, the general council has ordered the Rolling Mill Company to fill up its lot so as to support this additional embankment on the street, or to build a perpendicular wall.

We are then brought to the inquiry whether, under the circumstances, this is such an ordinary improvement as every lot-owner must be presumed to assent to when he purchases, or, in other words, such as the law contem-

plates the proper authorities may and likely will make; and, therefore, every purchase must be presumed to be made subordinate to this public right. The grade of Brook street was first fixed in 1836, and the improvement of the street in 1846–7 seems to have been done according to this grade, at least, no important alteration was made. The first rolling mill was erected with a view to this grade by Redd & Co., and no alteration was made when the present proprietors purchased in 1850, nor, indeed, when they erected their present much enlarged and more valuable establishment in 1861–2 and 3. It is said, however, their engineer advised the raising the foundation, else building at another place, because the grade of the street might be raised; but this, at most, was a mere vague opinion of an unauthorized person; for the only authentic data for the intentions of a deliberative assembly is its own official action; and the city council had, by no official act, manifested an intention to raise this grade; so far from this, it was not until 1864 that the ordinance was passed; and though perhaps some of the constituent elements of the council of 1864 may have been the same as that of 1861, yet it was not the same council, nor indeed was it possible, in 1861, to tell who would be the future councils, nor what they would do. The then council had manifested no authentic intention to change the grade of the street, and it could not be expected that proprietors would incur a large outlay upon the mere supposition of any man that some future council would raise the grade.

The grade of this street had been fixed in 1836; valuable and costly erections, and vast machinery to do a large manufacturing business, had been permitted, by the city authorities, to be erected without remonstrance or other authentic act manifesting an intention to raise the grade.

One rolling mill had been erected and adapted to this grade for a number of years, and operated, except some two years, until this new and enlarged establishment was erected. Both had a passway, which had been used to bring material to the mills and carry the manufactured articles therefrom, approaching this street, which will now be entirely closed up. Moreover, light and air, so essential to the operation of this machinery, especially in the three warmest months of July, August, and September, had been enjoyed according to the grade of 1836, since the first erection of the first mill, more than twenty years before this ordinance of 1864, which was not interrupted, we suppose, by the stoppage of the mill for some two years, as it was not abandoned as a rolling mill, but business simply suspended, with the intent to resume it by the same or other proprietors; for it is evident the buildings and machinery constituted the chief elements of value.

It is again said, that the Rolling Mill Company, in taking a deed for a portion of this square fronting Floyd street, accepted it with a covenant that the vendees consented that Floyd street should be raised to high watermark; but this could not affect their rights on Brook street, especially as they had no passway to and through Floyd street, and their erection had been done with no design to use it, but to use Brook street.

Our conclusion, then, is, that this improvement is of such an extraordinary character, and so peculiarly injurious to the proprietors of the rolling mill, that, so far from making them, at their own expense, damage their property so greatly, it should not at all be done without compensation to them. Nor can there be any peculiar hardship in this under the peculiar facts of this case; for, if the improvement is of great public utility, it will not

be an onerous burden for the public to pay the damage; if so, it would, of course, be a much greater and peculiar burden and hardship on these individual proprietors.

If the damages are great, they should not be imposed to the destruction of the individual proprietors. If they are not great, the burden on the public will be light. If too heavy to be imposed on the public, this should admonish the authorities not to impose them on the individual proprietors. Private property is too sacred, and the individual rights of the citizen are too well guarded under our constitutional form of government, to be sacrificed at the public behest without compensation or some overruling public necessity, in cases of emergency, such as vast conflagrations, &c.

Of course, in estimating damages, the situation of this property, its being subject to frequent inundation, the advantages to it from high embankments, should it be redeemed from overflow, are all legitimate subjects of consideration.

Should the city authorities desire to have the damages estimated, and to complete the contemplated improvement on Brook before adopting any general plan for improving the other streets, and should manifest this desire, the chancellor should so modify the temporary injunction as to permit it, and take the proper steps to ascertain the damages; but, as the city has not as yet signified this desire, we will not now direct a modification of the temporary injunction in this particular.

As the judgment and temporary injunction granted do not essentially conflict with these views, we see no reason to reverse on either the appeal or cross-appeal, and, therefore, the judgment of the chancellor is affirmed, with directions to him to keep control of the cause, and to modify the injunction, from time to time, upon proper application, as is herein suggested and indicated.

City of Louisville vs. Louisville Rolling Mill Company.

JUDGE ROBERTSON APPENDS TO THE ABOVE OPINION THE ORIGINAL OPIN-
ION, SLIGHTLY MODIFIED, AND ADHERES TO IT AS CONTAINING HIS VIEWS
YET UNCHANGED:

About twenty-four years ago a rolling mill was built, in the city of Louisville, on a square bounded by Brook street, running from Main to Water street, by Washington street, next and parallel with Main street, by Floyd street, running from Main to Fulton street, next to and parallel with the Ohio river, and by Water street, on, and parallel with, Beargrass creek, to its mouth. The buildings first erected and used were about twenty-five feet east of Brook street. And, in the year 1847, the owners were incorporated as the "Rolling Mill Company," but, not long afterwards, suspended operations for about two years; and, in the year 1850, sold the establishment to the present proprietors, who soon modified and extended the improvements; and, in the years 1861–2–3, re-edified on a new foundation, with a superstructure extending partially, about five feet, into Brook street, and about eight feet below the level of said street as then graded. The northeastern portion of the city, including the rolling mill square, and Brook street, from Washington street to the Ohio, has been subject to overflow "nearly every year, and sometimes twice a year;" and, during those inundations, the rolling mill and circumjacent streets and squares were so submerged as to be useless. To prevent the overflow would evidently improve the growing city and promote the interest of the owners of the rescued ground; and, for some time, most of those proprietors having desired the accomplishment of that end, the municipality, feeling its increasing importance, procured, in 1865, legislative authority for requiring those lot-holders to raise their ground correspondingly with a contemplated elevation of Fulton, Brook, and some other

streets, above high water-mark, as the only sure or prac-
ticable mode of securing the desired end; and, accord-
ingly, ordered the elevation of Brook street three feet
above its present grade, whereby it would be relieved
from overflow. The proposed grade would, therefore,
be eleven feet six inches above the foundation of the
rolling mill structure, which is, as before suggested, eight
feet six inches below the present grade; and this change
of grade would increase the difficulty of access from that
street and diminish wholesome ventilation of the mill on
that side, which would result to the damage of the own-
ers, and, as they say, would require a long. suspension of
their rolling operations, and a removal and reconstruc-
tion of their mill, to their irreparable damage. To pre-
vent these hurtful consequences, they filed a petition in
the Louisville chancery court for enjoining the contem-
plated change of grade in Brook street; and, after elab-
orate preparation on both sides, the chancellor, on the
hearing of the case, perpetuated the injunction, reserv-
ing the power hereafter to dissolve it on some just ar-
rangement between the parties, or a satisfactory payment
of proper damages; and this decree, indefinitely enjoin-
ing the city from prosecuting the projected work, is so far
final as to be revisable by this court.

In addition to the facts already recited, the testimony
sufficiently shows the following facts—1st. That the oper-
ations of the mill had been frequently suspended by
floods, and that the proposed elevation of the streets
will secure all that portion of the city against inunda-
tion hereafter, and will be eminently advantageous to
the local and the general public; 2d. That the incon-
veniences resulting to the appellee from the change in
the grade of Brook street may be, in a great degree,
obviated by an outlet to Floyd street already nearly

prepared, and by a stone wall hedging the eastern side of the embankment opposite to the mill, fixed with iron grates for ventilation; and 3d. That, when the present owners were about to reconstruct their mill, and extend its foundation, they knew that the city might elevate the grade, and had good reason to expect that a contemplated elevation would be made to prevent inundation, and, therefore, were advised by their engineer to change the location and not to extend the foundation to the street; but that they said, in effect, that it might be long before the grade would be changed, and that, if ever changed, they could recover adequate damages from the city; and, therefore, they persisted in building as they did build; and it seems, on the other hand—1st. That the mill is exceedingly useful to the city and profitable to its owners; 2d. That the reconstruction of it on any other foundation would cost a large sum, and suspend rolling operations for about eighteen months, to the great loss of the owners; and 3d. That, as now constructed, the difficulty of access, the want of sufficient light and air, and other inconveniences which would result from the change of grade, would considerably derange the operations and reduce the profits of the mill.

The appellee resists a reversal on three grounds—1st. A claim of prescriptive right to undiminished light and air; 2d. An implied pledge by the city never to change, to the damage of the mill property, the grade existing when the buildings were constructed; and 3d. A right to damages for the deterioration of that property, and assessment and payment before the grade shall be altered.

Neither of these grounds sustained the chancellor's decree:

VOL. III—28

1st. Prescription implies a grant; but, if the city authorities could have granted away, air and light, so as, in any respect, to cripple its necessary power to fulfill its trust for the public good, no such grant could be presumed without a continuous enjoyment for at least twenty years; but, in this case, the assumed privilege was interrupted from 1848 to 1850, and it was never enjoyed where it is now claimed until the present structures were completed in 1863; consequently, there is no available title by prescription.

2d. The city curators of the streets must have power to grade and preserve them, from time to time, so as faithfully to execute their trust in such manner as best to subserve the public interest in the free and unobstructed use of them; and no such fiducial power can be bargained away. If regrading became useful for faciliating safe and convenient use by the public, as the power to so regrade cannot be alienated by express contract, it cannot be lost by implied contract; for the law could not imply a contract when an express agreement to the same effect would be void; consequently, when a lot-holder on a street adapts his improvements to the existing grade, there can be no implied obligation never to change that grade so as to make it less eligible or convenient to him, and he must be presumed to have expected to hold and enjoy his improvements, subject, whether better or worse, to the power to change the grade as suggested by a proper regard for the common welfare. Such was the decision of this court in the case of *Keasy vs. The City of Louisville*, and other cases by this court, all fortified by the concurrent opinions of other American and British courts. The principle is plain, and the authorities are conclusive.

3. The prudent and careful exercise of an unquestionable power cannot, in ordinary cases, be a remediable

wrong, whatever incidental damage may necessarily result from it, *and cannot in this case entitle the appellee to damages to which the mill was exposed by a voluntary construction, with notice of the danger;* but if individual loss or inconvenience shall have resulted from the wanton, unskillful, careless, or unnecessary mode of execution, commensurable damages might be rightfully claimed.

Without any such improper execution, consequential damage is *"damnum absque injuria"*—damage without wrong—an inevitable loss, but, in the technical sense, no *injury*, and must, as a misfortune incidental to a right act rightly done, be borne without remedy; and this, too, has been adjudged in many of the foregoing cases.

This recognized principle, when applied to this case, implies that the grade must be elevated in such a manner and left in such secured condition relatively to the mill property as to guard it against all peril or inconvenience, which could be avoided by any reasonable mode of executing the work which would fully and properly effectuate the legitimate object of the required elevation of grade. To do all this is the duty of the municipal government, and, for any essential dereliction, it would be responsible for all resulting damage. But the petition does not charge that there is danger of any such misfeasance, nor could the chancellor judicially anticipate it, but he may prevent it, not by enjoining the elevation of grade, but by preventing everything unreasonable or unnecessary in the execution of the work; and by securing the appellee against all damage which could be avoided consistently with the official duty of the appellants, to reclaim a section of their city from inundations, which must retard the improvement and impair the value of the property of that entire section, and that especially of the appellees more than any other. When the owners of

lots in that quarter bought or improved them, they must be presumed to have expected that the progress of the city would require a considerable elevation of the surface of the streets, and probably of their lots also, to rescue their property from periodical and deteriorating floods.

They bought and improved on the contingency of such necessary change; and, when the appellees made and located their present improvements, the prospect of the change they now resist was imminent; and though it may, in some degree, increase the inconvenience to which they then subjected those improvements, it may, nevertheless, be more beneficial than hurtful in the lapse of time. But however this may be, *it could not be considered either unexpected or extraordinary ; because an elevation so obviously useful and adaptable to that section ought to have been expected, and, in the relative sense, should not be deemed locally extraordinary.* If the appellees may enjoin, every other lot-holder in the same quarter may do the same; and thus an improvement necessary for all, and almost exclusively useful to all of that section, may be forever prevented unless the owners of that local property will do, as perhaps they ought to do, the work at their own expense, or unless the city will do it and pay damages, at enormous cost to citizens who have comparatively but a very remote and slight interest in securing the property of others and enhancing its value.

Private property should not be taken or injured for the public benefit without compensation or the owner's consent. But tenure of lots in a city implies the consent of the owners to useful and natural changes in the grade of the streets; and the question here is, whether, considering the local liability to inundations, the contemplated change in Brook street is indicated by the natural surface, and will be useful to the local public. If so, the

City of Louisville vs. Louisville Rolling Mill Company.

city has a right to change the grade without paying damages to the owners of ground on that street, who hold subject to an implied consent to any such necessity, as much in this case as in that of *Keasy*, *supra*.

The judicial conclusion from the foregoing considerations is, that as there is no alleged or presumable danger of damage from a mal-execution of the work interdicted by the chancellor, he ought to have dissolved the injunction suspending the work altogether, and held the parties still in court for the ulterior purpose of regulating, on supplemental pleadings or otherwise, the execution of tne work so as to prevent all unnecessary damage to the appellee, which may be avoided without impairing the just rights of the appellant and the public.

Wherefore, the judgment is reversed, and the cause remanded, with instructions to dissolve the injunction and hold the case for the purpose just indicated.

NOTE BY REP.—The foregoing was prepared by JUDGE ROBERTSON as for the opinion of the Court—a majority of the Court not concurring with him, it was delivered as his dissenting opinion.